IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Michael Dykes and Wendy Dykes, | ) | |
| | ) | Civil Action No. 9:14-cv-3609-RMG-MGB |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| | ) | **AND ORDER** |
| Inmate Services Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The Plaintiffs seeks relief pursuant to state law as well as Title 42, United States Code, Section 1983 and Section 1988. (*See generally* Dkt. No. 1-1.) This matter is before the Court upon Defendant's Motion for Summary Judgment (Dkt. No. 90); Defendant's Motion to Exclude Plaintiffs' Proposed Expert, Dr. David Armstrong (Dkt. No. 91); Plaintiffs' Motion to Exclude Expert Testimony (Dkt. No. 92); and Plaintiffs' Motion to Exclude Designated 30(b)(6) Witness Testimony (Dkt. No. 93).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(d) and (f), D.S.C., all pretrial matters in the instant case have been referred to a United States Magistrate Judge for consideration.

Plaintiffs filed the instant Complaint in the Hampton County Court of Common Pleas on August 8, 2014; Defendant removed the case on September 10, 2014. (*See* Dkt. No. 1-1; Dkt. No. 1.) On November 6, 2014, Hampton County filed a Motion "for Joinder." (Dkt. No. 10.) On June 21, 2015, Hampton County's motion was granted, and Plaintiffs were instructed to file their Amended Complaint within fifteen days. (Dkt. No. 42.) Plaintiffs did so and filed a Motion to Remand. (*See* Dkt. No. 48; *see also* Dkt. No. 62.) On November 13, 2015, the undersigned conducted a hearing, during which the Amended Complaint was stricken as unauthorized; Hampton

1

County's motion was reopened and denied, such that Hampton County was no longer a party; and the case was restored to its posture prior to Hampton County's motion. (*See* Dkt. No. 62.)

On May 23, 2016, Defendant Inmate Services Corporation filed a Motion for Summary Judgment (Dkt. No. 90) as well as a Motion to Exclude Plaintiffs's Proposed Expert, Dr. David Armstrong (Dkt. No. 91). That same day, Plaintiffs filed two motions: a Motion to Exclude Expert Testimony (Dkt. No. 92); and a Motion to Exclude Designated 30(b)(6) Witness Testimony (Dkt. No. 93). These motions have been fully briefed and are ripe for review.

## I. <u>BACKGROUND</u>

Plaintiffs, a husband and wife, allege three causes of action against Defendant Inmate Services Corporation: (a) negligence/gross negligence; (b) violations of 42 U.S.C. § 1983, and (c) loss of consortium. (*See generally* Compl.; Dkt. No. 1.) Plaintiffs allege that Mr. Dykes "suffers from a severe form of diabetes, which was known or should have been known by the Defendant." (Dkt. No. 1-1 at ¶ 7.) According to Plaintiffs, Defendant accepted the care, custody, control and responsibility for Mr. Dykes on or about July 5th 2013 in transporting Mr. Dykes from the Hampton County Detention Center to another location. (Dkt. No. 1-1 at ¶¶ 10-11.) Plaintiffs allege that when Defendant's agents and/or employees "received custody of [Mr. Dykes], [he] was in declining health due to the lack of medical care at the Hampton County [D]etention Center" and that his "serious medical condition was patently obvious." (*Id*. at ¶ 10.)

Plaintiffs further allege that Mr. Dykes "made numerous complaints about his declining health, his urgent medical condition, dire need for medical attention and proper medications to Defendant corporation's agents and/or employees," but that these employees "failed to allow [Mr. Dykes] access to medical care" and "failed and refused to properly store and allow proper administration of the [Mr. Dykes'] necessary medications, . . . despite [Mr. Dykes'] instructions and repeated requests." (*Id*. ¶¶ 8-9, 12.) According to Plaintiffs, "as a direct and proximate result of the Defendant corporation's failure to provide medical care, treatment and proper medication, [Mr.

2

Dykes] suffered serious and debilitating bodily injury which required multiple amputations of his feet, ankles, and legs, which seriously and permanently damage[d] and disfigured [Mr. Dykes]." (*Id*. ¶ 13.) Plaintiffs seek, *inter alia*, actual and punitive damages. (*Id*. ¶ 14.)

## II. FACTS

As noted above, there are numerous motions pending in the instant action: Defendant's Motion for Summary Judgment (Dkt. No. 90); Defendant's Motion to Exclude Plaintiffs' Proposed Expert, Dr. David Armstrong (Dkt. No. 91); Plaintiffs' Motion to Exclude Expert Testimony (Dkt. No. 92); and Plaintiffs' Motion to Exclude Designated 30(b)(6) Witness Testimony (Dkt. No. 93). Before turning to the merits of the individual motions, a review of some of the evidence before the Court is helpful.

### A.    BEFORE ARREST

Mr. Dykes testified during his deposition in July of 2015 that he was first diagnosed as a diabetic "[p]robably 13 years ago, 14 years ago." (Dkt. No. 91-2 at 20-21.) When asked to describe his attention to his diabetic condition, Mr. Dykes stated, "I take very good care of myself." (Dkt. No. 91-2 at 21.) Mr. Dykes stated, however, that he did not have a primary care physician in 2007 or 2008; he indicated his first "true primary care physician" was Dr. Smith, whom Mr. Dykes began seeing in the latter part of 2012. (Dkt. No. 91-2 at 27.) When asked who would know Mr. Dykes' medical history from 2010 to 2012, Mr. Dykes stated,

> I couldn't really answer that, because I've pretty much on my own most of my life, so if I needed to go to the doctor, I went to the doctor. If I didn't, I didn't. So I don't think there's really anybody I could tell you to talk to on that basis.

(Dkt. No. 91-2 at 28.) When asked if he saw "anybody on a regular basis for the treatment of [his] diabetes before November 1, 2012," Mr. Dykes stated, "Like I stated before, only as need be." (Dkt. No. 91-2 at 134.)

Mr. Dykes was arrested and booked into the Hampton County Detention Center on June 18, 2012. (*See* Dkt. No. 97 at 1 of 9; *see also* Dkt. No. 90-1 at 6 of 24.) The record before this Court

contains only two medical records prior to Mr. Dykes' arrest: one dated June 12, 2012, from Low Country Health Care System, (Dkt. No. 90-4), and another dated June 15, 2012, from Palmetto Primary Care Physicians, (Dkt. No. 90-5). The June 12, 2012 record identifies Mr. Dykes as a new patient with insulin dependent diabetes mellitus, Type II, "who has been treating his own diabetes for the past year." (Dkt. No. 90-4 at 1-2 of 4.) The "physical exam" section of this medical record states, *inter alia*, "There is a small (less than dime sized[)] noninfected ulcer to the medial malleolar area of the right ankle." (Dkt. No. 90-4 at 2 of 4.) The record further states, "No edema is present to either lower extremity. Pulses appear to be adequate bilaterally." (*Id*.) As to the "wound open, knee/leg/ankle w/tendon," the notes state, "Started Bactroban 2%, Apply Ointment bid (sic) to wound on foot, 30 Ointment, 06/12/2012, Ref. x2." (Dkt. No. 90-4 at 3 of 4.)

Mr. Dykes was seen on June 15, 2012, by Christopher Egan, PA, at Palmetto Primary Care. (Dkt. No. 90-5.) The "history of present illness" section of the medical record states, *inter alia*,

On 06/15/2012, Michael Dykes . . . presented with:
. . .

–Diabetes Mellitus–Type I which began years ago. Severity was described as uncontrolled. Duration is constant. The timing was gradual onset. It is aggravated by poor diet and relieved by unknown. An associated sign and symptom is pt states he has severe neuropathy–pt has been on many meds, pt states he has severe pain from neuropathy. Glucose levels were reported by the patient to be high.

–neuropathy which began 4 months ago. It was located on the b/1 LE and was non-radiating. Michael characterized the quality as sharp and burning pain. Severity was described as moderate and severe. Context of injury was pt has severe DM I. Duration is constant. The timing was gradual onset. It is aggravated by poorly controlled DM I and relieved by insulin. An associated sign and symptom is pt states his last A1c was 11, + blurry vision, + b/1 neuropathy, + 3 P's.

(Dkt. No. 90-5 at 1 of 3.) The record indicates that Mr. Dykes has "open lesions on feet b/1" and/or "+2 mm scabbed wound on R medial malleous, no drainage." (Dkt. No. 90-5 at 1-2 of 3.) The "assessment" section of the medical record states as follows:

1. Diabetes Mellitus Type I, Uncontrolled

4

    2. Diabetic foot ulcer (NIDDM-adult-controlled), New

    3. Chronic Pain Syndrome, New

    4. Neuropathy lower extremity/Bilateral, New

(Dkt. No. 90-5 at 2-3 of 3.) The record indicates that the patient was counseled on "wound care and report[ing] worsening of symptoms/fever" and that he was to "use bactroban oint for wound." (Dkt. No. 90-5 at 3 of 3.) He was referred to an endocrinologist and pain management specialist; he was directed to have return visits in two weeks and one month. (*Id*.)

    B.    HAMPTON COUNTY DETENTION CENTER

    As noted above, Mr. Dykes was arrested on June 18, 2012, three days after his last medical appointment. During his deposition, Mr. Dykes stated that when he was arrested, his foot was so sore that he could not walk properly and the arresting officers "put their arms under [his] arms so [he] could walk, because [he] couldn't put any pressure on [his] foot." (Dkt. No. 91-2 at 35-37.) Mr. Dykes stated that when he went into custody at the Hampton County Detention Center, he told them about his health condition[1] and that he had an appointment the next day to see a surgeon, Dr. Montenegro, over his foot. (Dkt. No. 91-2 at 30.) Mr. Dykes stated, "Did everything but beg them [to take him to his appointment with Dr. Montenegro] and they didn't take me, that's why I'm sitting here looking like this right now." (Dkt. No. 91-2 at 30.) When asked when he first saw Dr. Montenegro, Mr. Dykes stated,

> I had only seen him prior–probably two weeks prior to [his arrest]. I had a little bitty spot on my toe and I was trying to save my foot at that time, I didn't want them to start cutting on me, so the options were I could go in and have a pump put in my foot

---

[1]Specifically, Mr. Dykes stated during his deposition that he told individuals at the Hampton County Detention Center the following upon his arrival:

> That I was a chronic diabetic, that I had a lesion on my foot, and I needed to be taken to a hospital ASAP, and they refused to do anything whatsoever for me other than throw me in the hole. And my wife went down there and said something to them.

(Dkt. No. 91-2 at 38.)

> to recirculate the blood and make it heal or they could put me in what they call an
> isolated chamber that force the blood flow to my foot.

(Dkt. No. 91-2 at 30; *see also* Dkt. No. 91-2 at 31-32.) Mr. Dykes plainly indicates that two weeks before his arrest, he showed Dr. Montenegro "a little small black spot on [his] great toe, [his] big toe." (Dkt. No. 91-2 at 32, 34.) [2]

Mr. Dykes saw Dr. Bush on July 2, 2012 (thirteen days after his arrest), while Mr. Dykes was incarcerated at the Hampton County Detention Center. (*See* Dkt. No. 90-6.) Dr. Bush noted in his written progress notes that Mr. Dykes had mild facial numbness and that his right foot (toe) was numb. (Dkt. No. 90-6.) Dr. Bush indicated that Mr. Dykes' foot color was "good," that his "dorsalis pedis pulse" was "good," and that Mr. Dykes was to see Dr. Vega on discharge. (*Id*.) Mr. Dykes described his encounter with Dr. Bush as follows:

> They sent a doctor in called–named Dr. Bush, he's about 80 years old, and he came
> in, looked at my foot, and told me I had cellulitis. Cellulitis is gangrene. And
> anybody that knows anything about a diabetic knows when a diabetic's got gangrene,
> you take him to a hospital immediately.

(Dkt. No. 91-2 at 39.) Mr. Dykes indicated that Dr. Bush gave him "a tube of triple antibiotic cream which was completely useless for what was wrong with [him]." (Dykes Dep. at 39.) Mr. Dykes testified that the Hampton County Detention Center did give him insulin after about a week in custody, but that his diet was not adequate. (Dkt. No. 91-2 at 39-40.)

## C.    TRANSPORT BY DEFENDANT

Mr. Dykes left the Hampton County Detention Center on July 5, 2012, in the custody of Defendant Inmate Services Corporation. (Dkt. No. 90-20 ¶ 3; Dkt. No. 90-1 at 6 of 24; Dkt. No. 97 at 2 of 9.) Defendant transported Mr. Dykes to Missouri; he arrived there on July 8, 2012. (*See* Dkt. No. 90-7; Dkt. No. 90-8.) When asked what material, documents, or medications he brought with him on the trip to Missouri, Mr. Dykes stated,

---

[2] There is no documentation in the record of a visit to Dr. Montenegro prior to June 18, 2012.

> The only thing they gave me from the jail is they give me some needles and some insulin and the drivers threw it up on the dashboard. It was about 110 degrees, so the insulin was shot within 20 minutes. I couldn't take it because it was boiling in the sun through the windshield.

(Dkt. No. 91-2 at 45.) When asked what Mr. Dykes initially told the agents of Inmate Services Corporation, Dykes said,

> I told them that I was a chronic diabetic and that I needed more food to keep my sugar up. And they seemed to think that was a joke. Told me if you don't like the treatment, you shouldn't have done the crime, something to that effect. So I kept my mouth shut and then about two days later I ended up in the floor and they turned one of their inmates loose to work on me, a woman. It's a good thing her son was a diabetic, because if he wasn't, I'd probably be dead right now.

(Dkt. No. 91-2 at 48.)

Mr. Dykes testified that he had to be helped into Defendant's van by other inmates and one of the guards and that he crawled on his knees to get to a seat. (Dkt. No. 91-2 at 44.) He was chained with a belly chain and handcuffs, and was chained to "a thing in the floor that they chained everybody to I guess." *Id*. Mr. Dykes indicated there were no diabetic supplies in the transport vehicle; that the vehicle never stopped to buy additional diabetic supplies; and that there was no cooler available for his insulin. (Dkt. No. 91-2 at 50-51.) He stated that ISC did not have testing strips and "refused to buy" testing supplies for him. (Dkt. No. 91-2 at 135.)[3] Mr. Dykes stated that Hampton County did not give Inmate Services Corporation the Bacitracin; he says the "only thing" he remembers seeing Hampton County give ISC was "a bag with that insulin and some needles in it, and that's–and they threw that up on the dashboard." (Dkt. No. 91-2 at 122-23.) When asked whether he took his blood sugar levels during his transportation from South Carolina to Missouri, Mr. Dykes stated that ISC "didn't do anything. There was no monitoring, there was no nothing."

---

[3] One of the Defendant's few records relating to Mr. Dykes' transport included two Walgreen receipts: from July 5, 2012 for "True-2-GO BLD GLC MTR PURPLEX"; and July 7, 2012 for "TRUETEST BG TEST STRIPS". There is no testimony in affidavit or deposition from the drivers of the van or prisoners being transported with Mr. Dykes.

(Dkt. No. 91-2 at 134-35.) He also stated that he was not allowed to apply the bacitracin ointment even one time during the trip with ISC. (Dkt. No. 91-2 at 124-25.)

Mr. Dykes testified during his deposition that he "went into a coma in the van" on the third day of the transport. He stated:

> The third day in the van I fell out. What happened is my blood sugar dropped to the point that I passed out. And, like I said, they turned the girl loose–an inmate loose in the van because they did not know what to do.
> They ran up in a truck stop and she grabbed some orange juice and shoved it down my throat and she told me that I was out for about 15 to 20 minutes. And as soon as I came to, they jumped back in the van and took off.
> And the one driver, it flipped–it flipped him out pretty bad, he didn't–he didn't know what to do. He–he actually gave me a couple pieces of candy and I remember that and that was all I remember. The other guy is–they were just wanting to get me to where I had to go at that point.

(Dkt. No. 91-2 at 55-56.) The following exchange occurred during Mr. Dykes' deposition:

> Q. What is it that you claim the Inmate Services Corporation agents did not do for you?
>
> A. Did not do for me?
>
> Q. Yes, sir.
>
> A. Well, Number 1, they didn't have a van equipped to haul somebody with my medical problems. They destroyed my insulin by throwing it up on the dashboard. I think when I went into the–when I passed out from low sugar, I should have been taken directly to an emergency room somewhere. And I do not believe that an inmate should have been let go to work on me because she could have killed me.

(Dkt. No. 91-2 at 64-65.)

### D.     OZARK DETENTION FACILITY IN MISSOURI

Mr. Dykes arrived in Missouri on July 8, 2012. On July 10, 2012, Mr. Dykes submitted an Inmate Request Form with the Ozark County Adult Detention Facility in Missouri.[4] (Dkt. No. 90-13.) On this form, Mr. Dykes stated, "My left hip is burning badly from diabetic neuropathy. My

---

[4] To the court's knowledge, the Ozark County Adult Detention Facility has not been sued by the Plaintiffs.

right foot 'toe' is black and infected and it is hurting bad I need to see a doctor." (Dkt. No. 90-13.) The form indicates an appointment is to be made. (*Id*.)

Mr. Dykes was seen at the Gainesville (Missouri) Medical Clinic on July 18, 2012. (Dkt. No. 90-2.) This medical record describes Mr. Dykes as having a black sore on his right great toe as well as two black spots on his right foot for "2 weeks maybe longer" and notes he has "been in jail x9 days." (Dkt. No. 90-2 at 2 of 2.) This same medical record indicates Mr. Dykes has pain in his right foot and "spots x 4 weeks." (*Id*.) Mr. Dykes submitted a second Inmate Request Form on July 19, 2012; on that form, he stated,

> I recently put in a request to go to a doctor and was taken to see a nurse practitioner that is fine for people with "general medical problems." "However" I need to be seen by a "doctor" not a nurse or a "PA." A Doctor. I am a "chronic" "diabetic" with chronic care issues. I have several diabetic issues that only a doctor can take care of. If I cannot see a doctor please tell me for I have a really bad foot and other diabetic issues that need[] to be taken care of.

(Dkt. No. 90-14.) The "response" section of that form indicates that Mr. Dykes was taken to see Dr. Newton on July 20, 2012, and "was told to monitor blood sugar readings for a month and return." (*Id*.)

Mr. Dykes submitted another Inmate Request Form on July 21, 2012; on that form, he stated,

> I am due to have my 3-month blood tests for my diabetes actually I'm about 2 weeks over due. So I will need to be taken to a doctor for this procedure soon. It's a every "90 day" procedure.

(Dkt. No. 90-15.) The "response" section of that form indicates that Mr. Dykes was taken to Dr. Newton's office on July 20, 2012, and Dr. Newton "made appt for 30 days to check blood sugar" but there was "no mention of any other blood test." (Dkt. No. 90-15.)

Mr. Dykes submitted a fourth Inmate Request form to the Ozark County Adult Detention Facility on July 22, 2012, reiterating that he is a "chronic care diabetic" and  requesting his annual liver and kidney tests at a local hospital. (Dkt. No. 90-16.) The response states, "If this is required by the medical release you gave clinic it will be done." (Dkt. No. 90-16.)

Mr. Dykes left the Ozark County Adult Detention Facility on July 24, 2012. (Dkt. No. 91-2 at 73-74.) His right great toe was amputated on October 23, 2012. (Dkt. No. 97-2 at 93.) Mr. Dykes subsequently had the middle part of his right foot amputated, then below the knee on his right leg. (Dkt. No. 97-2 at 47-48.) After those amputations, his left leg was amputated. (Dkt. No. 97-2 at 48-50.) Plaintiffs' expert attributes all of those amputations to the actions of Defendant. (*See* Dkt. No. 97-2 at 47-50.)

## III.  MOTIONS TO EXCLUDE EXPERT WITNESSES

### A.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. A trial judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  Evidence is admitted if it "rests on a reliable foundation and is relevant." *Daubert*, 509 U.S. at 597.  The party offering the expert witness testimony bears the burden of demonstrating "its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

The district court's role as gatekeeper is an important one. Expert witnesses have the potential to be both powerful and quite misleading, so the court must ensure that any scientific testimony is both relevant and reliable. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d at 199 (citation

omitted). *See also*, *In re Lipitor (Atorvastinin Calcium) Marketing Sales Practices and Products Liability Litigation*, 174 F. Supp. 3d 911, 920 (D.S.C. 2016); and *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 601 (S.D.W. Va. 2013). The court need not determine that the expert testimony is "irrefutable or certainly correct". *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006) (citations omitted). "As with all other admissible evidence, expert testimony is subject to testing by '[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id. See also, In re C.R.Bard, Inc.*, 948 F. Supp. 2d at 601; *In re Lipitor,* 174 F. Supp. 3d 920. As stated in *In re Lipitor,* 174 F. Supp. 3d at 920-921:

> The Court is mindful that the *Daubert* inquiry involves "two guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). 'On the one hand ... Rule 702 was intended to liberalize the introduction of relevant expert evidence," *id*. and "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system.' *United States v. Stanley*, 533 Fed. Appx. 325, 327 (4th Cir. 2013), *cert. denied*, --- U.S. ----, 134 S.Ct. 1002, 187 L.Ed.2d 852 (2014). On the other, "[b]ecause expert witnesses have the potential to be both powerful and quite misleading, it is crucial that the district court conduct a careful analysis into the reliability of the expert's proposed opinion." *United States v. Fultz*, 591 Fed.Appx. 226, 227 (4th Cir. 2015), *cert. denied*, --- U.S. ----, 135 S.Ct. 2370, 192 L.Ed.2d 159 (2015); *accord Westberry*, 178 F.3d at 261.

*Daubert* highlights some factors to guide the overall relevance and reliability determinations that apply to all expert evidence: (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003) (quoting *Daubert,* 509 U.S. at 593-94, 113 S.Ct. 2786); *see also, In re Lipitor,* 174 F. Supp. 3d at 920 ("[h]owever, these factors are neither definitive nor exhaustive.... and 'merely illustrate [] the type of factors that will bear on this inquiry'" (citations omitted)); *see also In re Bard, Inc.*, 948 F. Supp. 2d at 601-602 ("Despite these factors, '[t]he inquiry to be undertaken by the district court is

11

'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 594-95, 113 S.Ct. 2786); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("We agree that [t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on  the nature of the issue, the expert's particular expertise, and the subject of the testimony (citations omitted.) *See also*, *Tyree v. Boston Scientific Corp.*, 54 F. Supp.3d 501, 516 (S.D.W. Va. 2014).

**B.**    DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' PROPOSED EXPERT (Dkt. No. 91)

In this motion, Defendant moves to exclude "all the opinions" of  Plaintiffs' expert, Dr. David Armstrong of Arizona, citing Rule 702 of the Federal Rules of Evidence as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Dkt. No. 91 at 1 of 11.) Defendant states,

> This lawsuit arises out of [a] claim that Plaintiff Michael Dykes' amputation of his great right toe, right toes, right foot, and left foot resulted from actions and inactions by ISC during a three-day transportation on July 5-8, 2012 when ISC transported Dykes from the Hampton County, South Carolina Detention Center to the Ozark County Adult Detention Center in Gainesville, Missouri. Plaintiffs' expert (Dr. David Armstrong of Arizona) purports to offer opinions regarding actions or inactions by ISC during the transport and also attempts to connect the alleged development of a black spot on Dykes' right toe to the transport. Defendant moves to exclude all the opinions of Dr. Armstrong because he lacks any qualifications to discuss the applicable standard of care or any industry standards when transporting inmates, he bases his asserted opinions on speculative interpretation of one medical record (while ignoring Plaintiff Michael Dykes' deposition testimony), and his opinions about causation are unreliable.

(Dkt. No. 91 at 1-2 of 11.)

Defendant does not seem to challenge the general qualifications of Dr. Armstrong, but challenges his opinions and conclusions. Dr. Armstrong's Curriculum Vitae ("CV") is two hundred forty-nine (249) pages long. Presently, he is a Professor of Surgery at the University of Arizona College of Medicine in Tucson, Arizona; Professor of Biomedical Engineering at the University of

12

Arizona, appointed faculty for the University's Bio5 Institute and for the University's Sarver Heart Center; the founder and director of the Southern Arizona Limb Salvage Alliance; and Deputy Director of the Arizona Center for Accelerated Biomedical Innovation. (Dkt. No. 97-3 at 2.) In addition, he is presently a visiting professor and adjunct professor at the University of Manchester, United Kingdom, and the New York College of Podiatric Medicine. (*Id*. at 3.) He has written and lectured extensively on treatment of the diabetic foot, diabetic foot infections, wound healing and amputations. (Dkt. No. 97-3 at 26-220.)

The Defendant challenges Dr. Armstrong's theory of the development of Plaintiffs' foot wound and his theory of foot protection. (Dkt. No. 91 at 4-11. ) Dr. Armstrong testified in his deposition generally about diabetics and the risk factors for developing foot infections and specifically about the Defendant's condition before, during and after the transport by Defendant.

### 1. SUMMARY OF EXPERT TESTIMONY

#### a. Foot Wound Development

Dr. Armstrong testified in his deposition that prior to his incarceration, Mr. Dykes

> had diabetes, appears to have been insulin-requiring diabetes, at least, and he had a long history of smoking, a past history of stroke, a past history of painful diabetic neuropathy, as well as numbness–so, painless diabetic neuropathy, as well. And I believe also hypertension and hypercholesterolemia and hypertriglyceridemia." Armstrong stated that based on the information provided to him, it does not "look like [Mr. Dykes] was getting good, consistent diabetes care" before July 8, 2012.

(Dkt. No. 91-3 at 21, 34-35.)

Dr. Armstrong did not have any criticisms of the approach taken by Low Country Health System on June 12, 2012, or by Palmetto Primary Care Physicians on June 15, 2012. (Dkt. No. 91-3 at 37.) He noted that the June 12, 2012 record described the Defendant as having "a wound most likely on his ankle - although it does say open lesions..... on feet, bilateral." (Dkt. No. 91-3 at 30.) As to criticisms of the medical treatment given to Mr. Dykes at the Hampton County Detention Center before he was transported to Missouri, Dr. Armstrong stated,

13

> I believe that optimally, especially with a numb foot like this and a past history of wounds to his legs, that maybe he should have gotten some more attention paid to protecting his feet. And so I would have considered a possibility of putting him into, at very least, more appropriate shoes, and/or just putting him into something that would protect his feet, like a wheelchair.

(Dkt. No. 91-3 at 39.) He had no further criticisms of the approach taken by the medical professionals while Mr. Dykes was incarcerated at Hampton County Detention Center. (Dkt. No. 91-3 at 40.)

He stated that prior to being transported to Missouri on July 5, 2012, it does not appear that Mr. Dykes had an infection on his feet but that he had an ulcer on his ankle. (Dkt. No. 91-3 at 39-40.) When asked about his criticisms of Inmate Services Corporation from July 5-8 of 2012, when they transported Mr. Dykes from South Carolina to Missouri, Dr. Armstrong stated,

> Again, I believe that a person with loss of protective sensation, with numb feet, that's already had a wound, probably should be better protected. They shouldn't be barefoot in just flip-flops, and certainly, if possible, not shackled up around the ankle, which is where he had a wound in the first place, but anywhere.
> And I think attention should be given to that high risk lower extremity, if someone doesn't have the gift of pain.

(Dkt. No. 91-3 at 40-41.)

Dr. Armstrong stated that the Defendant, having a wound like the ulcer on his ankle in the near recent past, would be at a much higher risk of getting another wound. (*Id* at 40.) He later further stated,

> Q. You indicated that somehow Inmate Services Corporation could have better protected Mr. Dykes' numb feet, and you mentioned not having him wear flip-flops?
> A. Not to be shackled, not to be wearing flip-flops. And again, with someone with such an obvious risk factor as a previous history of a wound in the immediate past, that should raise all kinds of red flags as to the fact that he . . . is at really high risk for getting another problem. And putting something around his ankles–whether or not there was something around his ankles, but certainly with shackles around his ankles, and putting him in a confined area with flip-flops that may or may not fit, that are putting pressure on the big toe for sure, are–is just–it's not optimal, and in this case it appears as though it caused a wound.
>
> Q. What caused the wound [on his right great toe]?

14

A. Either constant, low-grade pressure during the trip, or constant, low-grade pressure coupled with repetitive pressure and shear over that area when he was getting in and out of the van, or possibly some other injury.

Q. At the time Mr. Dykes was transported from Hampton County South Carolina to Ozark County Missouri, what signs did he have that were visible, regarding any medical condition?
A. That's the danger of diabetes, is a lot of these problems are silent and invisible. People can wear a hole in their foot like they wear a hole in their shoe or sock. And that's why attention to this is really important. Any of these signs are silent. This is what happens throughout diabetes, in general. They can get silent heart attacks, or they can get a silent foot attack.

Q. Well, did Mr. Dykes have, based on your review of the medical records, any signs of any type of black spots or injury to his toe or his feet during the transport?
A. The information that we have from Dr. Bush, which was on the 2nd, so before the transport of course, was I believe the last bit of information that we have, which was that he said the foot color is good and the dorsalis pedis pulse is good, and that he had numbness in his feet and some numbness in his face.
So that is–that is the last information we have, I think, before he files a grievance or complaint for a medical problem when he gets to Ozark County, on the 10th.

Q. So your review of the medical records does not show any evidence that there was a change in color of Mr. Dykes' toe or foot during the transport to Missouri; correct?
...
A. I'm not sure there was a medical record specifically about his foot during that. So I would say I agree with you, there was no sign of that happening in any medical record.

(Dkt. No. 91-3 at 41-44.)

He stated that Mr. Dykes' poor blood flow played "a role, but did not cause the wound in the

first place. .... the blood flow... reduces the likelihood of healing or bouncing back from that injury."

(Dkt. No. 91-3 at 46-47.) Dr. Armstrong stated that he attributed the ultimate amputation of the great

toe on Mr. Dykes' right foot to an occurrence during the transport from South Carolina to Missouri:

He either had a wound before he got on the transport, which is possible. But if we take Dr. Bush at his word, then he–then we'll say that he may have developed a wound, or tissue loss as it were, on the transport.
That was reported on the 10th, after arriving in the Ozark County jail. That then deteriorated over the course of time to lead to amputation, later in the year, of the big toe, then of the middle part of the foot, then below the knee on that foot.

15

(Dkt. No. 91-3 at 47-48.) Dr. Armstrong attributed all of those amputations to the three days in the van. (Dkt. No. 91-3 at 48.) He also attributed Mr. Dykes' subsequent *left* leg amputation to the tissue loss that occurred, stating that "a constellation of events occurred there that led to all of the subsequent complications." (Dkt. No. 91-3 at 48-49.) Dr. Armstrong stated,

> The initial wound, subsequent gangrene of the digit, the amputation of the big toe. Then the transmitted tarsal amputation a few weeks after that. Then the below-the-knee amputation a few weeks after that. Once getting a below-the-knee amputation, it's–the amount of stress that you apply to the contralateral, the other foot, in this case the left foot, is generally speaking much higher, and you're at much higher risk to getting a sore there. And that's what occurred on the other foot. And it subsequently devolved from there. ...
>
> Q. Do you consider the possibility exists that whatever wound Mr. Dykes complained about two days after delivery to the Ozark County Detention Center, that that wound was caused by some event that occurred at the Ozark County facility?
> A. I think it's possible.
>
> Q. And if that, in fact, is what happened, then any attribution of blame to any events with Inmate Services Corporation would not be correct; is that fair?
> A. If that happened, then that would be correct. Absolutely.
>
> Q. And do you have any information that positively indicates Mr. Dykes had some sort of wound or event that caused a wound during the three-day transport?
> A. Only based on his history and the–and my assessment, as I mentioned, that I believe it's much more likely than not that the injury occurred between that time during the transport and not after he arrived in those other two days.
>
> Q. All right. And what is the distinction?
> A. Distinction is that he was sitting in a van and–on a numb foot, and was not protected. That then–and then that ultimately placed him at much greater risk for tissue loss, which happened during that trip, most likely.

(Dkt. No. 91-3 at 49-51.)

Dr. Armstrong reiterates the likelihood of the wound developing during transport several more times in his deposition, at times with qualification under rigorous cross examination. Dr. Armstrong stated,

> A. His wound occurred sometime between the 2nd of July and the 10th of July. It's possible also that there was a wound present beforehand, but it was either, A, not identified by Dr. Bush, which is a possibility, but we can give Dr. Bush that, or I have

no other medical records to guide me before the 2nd, other than the medical records from Low Country and Palmetto, which indicated the wound on the right ankle.

Q. All right. We already established you don't know, in fact, whether or not that [wound on his great toe] occurred during the trip; correct?
A. Only based on his history and the information that we have before us.

Q. I'm not following if that answered my question.
A. I believe that this occurred during between–during transport. I do believe that. I believe it is more likely than not that it did for the reasons we already described.

Q. And you cannot state with any type of certainty that the wound absolutely developed during that time period; correct?
A. I cannot state that it absolutely occurred during that time frame.

(Dkt. No. 91-3 at 58, 75-76.)

Dr. Armstrong noted that Mr. Dykes reported a wound on July 10, and "[i]t apparently occurred within a couple of weeks before that, based on the information that we have." (Armstrong Dep. at 77.) "[I]t's more likely than not that [the wound] occurred between . . . transport and it being reported" on July 10. (Dkt. No. 91-3 at 77.)

Q. All right. So, other than–getting back to the earlier question, can you give me any other fact to support your contention that the wound developed during the transport from Hampton County South Carolina to Ozark County Missouri, other than the July 18th note from the Gainesville Medical Center?
A. Other than the July 18th note, which is also framed by the July 2nd note from Dr. Bush, no.

(Dkt. No. 91-3 at 85-86.)

Even if the wound occurred after Mr. Dykes was in Missouri, Dr. Armstrong would not completely absolve ISC of responsibility, stating that Mr. Dykes was,

placed at much, much higher risk for developing tissue loss if he's sitting in a car with pressure up against some flip-flops or against the floor of the car, again with neuropathy and previous history of an ulcer, and peripheral artery disease, for a couple days. And then jumping in and out of the car also placed him at higher risk, and that repetitive stress may have also put him at greater risk.

(Dkt. No. 91-3 at 58-59.)

17

When asked what medical literature supports his conclusion, he said that there is "abundant data to show that someone with neuropathy and peripheral artery disease and diabetes for an extended time are at very high risk for getting a wound. (Dkt. No. 91-3 at 60); that "there is even better data than that to show the outcome of not only amputations of the limb, but then of the contralateral limb after – after an amputation." (*Id.*) "Our team have published these data. I ... was the chair of the American with Diabetes Association's Foot Care Council when we developed clinical care for the diabetic foot... ." (*Id.*) Dr. Armstrong also directed Defendants' counsel to peer-reviewed literature for those propositions. Dr. Armstrong did admit that there was no medical literature identifying the exact time a black spot is going to occur after a wound, but that he based that opinion on his own experience. (Dkt. No. 91-3 at 122-123, 128.)

Dr. Armstrong traced the ultimate amputations to the wound development during transport:

Q. How is it that you trace the ultimate amputation for his right great toe on October 23, 2012, to the wound, when he received, in your opinion, appropriate medical care from July 24, 2012, to October 23, 2012?
A. When he had tissue loss in that period between the 2nd and the 10th, he had–that was the inciting event that led to the constellation of events that ultimately led to him losing his great toe.  Failure to heal that, because of blood flow and further tissue loss and increased risk for infection that led to his midfoot amputation, and that led to his below knee amputation.

Q. Is the black spot an indication of gangrene?
A. The black spot is an indication of either gangrene, pre-gangrene, or some bleeding into the skin.

Q. Is it something, with proper care and attention, can be avoided?
A. Yes.

Q. All right. And is it something that, again, develops very rapidly overnight, or does it develop over a period of several days?
A. Typically, it occurs over a span of several days.

Q. Okay. And is that part of the basis for your opinions in this case, as to when Mr. Dykes most probably developed his foot wound?
A. Yes.

(Dkt. No. 91-3 at 94, 122-23.)

18

Q. Your reference to typically that the black spots do not appear for a span of a couple days, that medical literature are you relying on?
A. The medical literature on that, identifying the span of time from tissue loss, is based only on my expert opinion.

Q. Is there any medical literature that supports that conclusion?
A. There are no data, to my knowledge, to show that a–over which exact time a wound is going to occur. But I can tell you that in seeing in our unit over the span of 20 years, with our 10,000 patient visits a year, typically what–how these things progress.

Q. All right. Can you cite me to the name of any peer-reviewed literature that supports your opinion?
A. Not for one day versus several days. Only my expert opinion.

Q. Okay. So there is no peer-reviewed medical literature that definitively defines when the black spot will appear after some sort of event causing a wound?
A. That's correct.

Q. And the period of time can be anywhere between one day and six, seven, right days?
A. Yes. It could. Or even more than that.

Q. What is the outermost time period for the wound to develop?
A. The outermost could be, now with really extraordinary assessment, sometimes upwards of a month out. However, that is only based on whole monitoring with newer equipment.
However, the data that we have, which is again, from the 2nd to the 8th, when he was dropped off, is what we have. And so it is more likely than not that this tissue loss occurred.

(Dkt. No. 91-3 at 127-28.) He admitted it was possible the wound could have taken place after Mr.

Dykes saw Dr. Bush on July 2nd but before he was transported. (Dkt. No. 91-3 at 128-29.)

Dr. Armstrong indicated it was "highly unlikely" Mr. Dykes had a diabetic coma on the trip,

stating he "may have been hypoglycemic and taken a dip and fainted." (Dkt. No. 91-3 at 54-55.) Mr.

Dykes only mentions the word "coma" once in his deposition, and describes the episode in the van

as his blood sugar dropping to the point he passed out, (Dkt. No. 91-2 at 55-56) and later in the deposition as "I passed out from low sugar." (Dkt. No. 91-2 at 64-65.)[5]

          b.  Foot Protection

Dr. Armstrong testified that Mr. Dykes should have been transported wearing "protective footwear," which "might be something like a prescriptive-type shoe, or sandal . . . , that has enough room and is very soft, that could protect the bottom and the sides and the top of the toes and foot." (Dkt. No. 91-3 at 64.) He acknowledged that a doctor is the one who would prescribe that type of footwear but that he was unaware of any doctor prescribing such footwear to Mr. Dykes prior to July 5, 2012. (Dkt. No. 91-3 at 64.)

> Q. How do you jump and criticize the transport folks for not ensuring that he had this prescribed footwear, when at the time they picked him up, no medical person prescribed such footwear?
> A. I believe that someone with a–when Dr. Bush assessed it, and he had a numb foot, and therefore was at very high risk for developing other complications, talking to him and getting a history from him would have identified that he had a previous history of a complication.
> That, coupled with the problems that he may have had getting around, would have at least allowed the–a jail or the transportation company to give him some kind of accommodation, either a wheelchair, protective shoes, something to protect him. And that didn't happen.
>
> Q. Is there any standard that you know of that requires a jail transport company to go behind the conclusions and recommendations of a physician who has actually treated a patient to ensure that all aspects of the medical care for that patient has been addressed by the medical professionals who actually treated the patient?
> A. No.

(Dkt. No. 91-3 at 65-66, 70.)

He stated that he did not have any knowledge that the transport of Mr. Dykes by Defendant "violated any applicable standard of care in the field of inmate transportation." (Dkt. No. 91-3 at 71.)

---

[5] This is consistent with Dr. Armstrong's testimony and does not support Defendant's argument that his opinion is unreliable or speculative.

2. ANALYSIS

The Defendant's Motion to Exclude is **DENIED**. Dr. Armstrong is a qualified podiatric surgeon with extensive experience treating diabetics at risk for infection from wounds, wound progression and the potential causes of amputation in diabetics. His general knowledge will be helpful to the jury at trial, is obviously relevant, and is based on his experience and on peer reviewed literature. His specific opinion on the time period that the toe wound developed is based on his twenty years of experience in the field. As demonstrated by counsel for the Defendant in the doctor's deposition, his opinions are capable of being challenged on cross-examination.[6] The court need not determine that Dr. Armstrong's testimony is "irrefutable or certainly correct". *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006)(*citations omitted*). "As with all other admissible evidence, expert testimony is subject to testing by '[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id. See also, In re C.R.Bard, Inc.*, 948 F. Supp. 2d at 601; *In re Lipitor,* 174 F. Supp. 3d at 920.

To the extent that Mr. Dykes gives contradictory testimony about when the toe wound appeared (Dkt. No. 91 at 4-8), Dr. Armstrong also relied on the two medical records book-ending the transport to render his opinion: Dr. Bush's notes of July 2 from Hampton County Detention Center and Mr. Dykes' complaint at Ozark County on July 10. (Dkt. No. 91-3 at 41-44.) The credibility of Mr. Dykes is a fact issue to be determined by the jury, not by this court on a motion for summary judgment. "Where the determination of what actually happened depends on an assessment of the credibility of the respective witnesses, '[t]his assessment is a disputed issue of fact [that] cannot be resolved on summary judgment.'" *Zoroastrian Ctr. & Darb-E-Mehr of Metro.Washington, D.C. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 751 (4th Cir. 2016)(quoting *Rainey v. Conerly,* 973 F.2d 321, 324 (4th Cir. 1992)); *see also Anderson v. Liberty Lobby, Inc.,* 477

---

[6] Both Plaintiffs' and Defendant's experts struggle with a definitive opinion because of the paucity of written records, medical and otherwise.

U.S. 242, 248 (1986). The issues in the case are broader than just when the toe wound developed. Dr. Armstrong also testified that **even if the wound did not develop during the transport**, he would not absolve the Defendant of all responsibility because the Defendant's method of transport placed Mr. Dykes at much greater risk for tissue loss.[7]

Dr. Armstrong's opinion about the need for foot protection was based on his experience and on peer reviewed literature, and makes common sense. Whether the Defendant transport company should have independently provided protection for Mr. Dykes' feet without a medical order/prescription to do so, also is subject to cross-examination and the presentation of contrary evidence, such as Defendant's expert, Dr. Dolven. Dr. Armstrong testified that with a diabetic like Mr. Dykes, who had a numb foot, who was at high risk for developing other complications and had a previous history of complications, coupled with Mr. Dykes' mobility problems, the transport company or jail should have given him some sort of accommodation, such as a wheelchair, protective shoes, something to protect him. (Dkt. No. 91-3 at 70.)

Dr. Armstrong's lack of opinion on the standard of care for the transport company does not render his medical opinions any less reliable or less relevant. Dr. Armstrong's qualifications appear undisputed and are supported by the record, including his CV. This is not a medical malpractice case about a physician's standard of care. This is a negligence/gross negligence and deliberate indifference to serious medical need case. It involves a continuum of care, or lack thereof, by several entities, including the Hampton County Detention Center, the subject of a separate lawsuit in state court. This is a case where comparative negligence will be considered by the jury, and the Answer (Dkt. No. 4 at 3) and Defendant's cross-examination of Dr. Armstrong reflect the likelihood of this defense. The

---

[7] As will be discussed *infra*, taking the facts in the light most favorable to the Plaintiffs, the Defendant did not even transport Mr. Dykes to a medical facility or call an ambulance when he passed out in the van, which was in violation of its own policy.

court cannot say that Dr. Armstrong's opinions are so unreliable and speculative as to render them inadmissible.

The court finds by a preponderance of the evidence that the expert testimony of Dr. Armstrong is relevant and reliable and is subject to testing by vigorous cross-examination at trial, presentation of contrary evidence, and careful instruction on the burden of proof. The Plaintiffs' Motion to Exclude Proposed Expert Dr. David Armstrong is **DENIED**.[8]

C.    PLAINTIFFS' MOTION TO EXCLUDE CERTAIN OPINION TESTIMONY (Dkt. No. 92)

Plaintiffs move to exclude certain opinion testimony of Defendant's expert witness. Plaintiffs contend that the opinion testimony of Dr. Sarah Dolven should be excluded because "her opinion fails to meet the relevancy and reliability criteria set forth" in Rule 702 of the Federal Rules of Evidence and *Daubert*. (*See* Dkt. No. 92 at 1 of 10.) Plaintiffs assert that Dr. Dolven, Defendant's designated medical expert, may not "render opinions or reports on matters outside of [her] field of specialized knowledge, specifically when said expert is an endocrinologist and the opinion sought is more properly evaluated by a vascular surgeon, and the expert admits that she lacks expertise in that field." (Dkt. No. 92 at 1 of 10.)

The Plaintiffs argue that Dr. Dolven's testimony should be excluded because: 1) her opinions are not reliable because they cannot be tested; 2) her opinions are not supported by peer review; 3) her opinions were prepared solely for purposes of litigation; 4) her qualifications are as an

---

[8] To the extent that the Defendant requests an amended scheduling order for the limited issue of allowing the Defendant to retain the services of a vascular surgeon to address the opinion of Dr. Armstrong, the court finds that it is not necessary, as both Defendant's and Plaintiffs' experts agree that the toe wound could have occurred during the transport, or not. See Dr. Armstrong's testimony at Dkt. No. 91-3 at 47-48, 50-51, 75-76; and Dr. Dolven's testimony at Dkt. No. 92-3 at 31, 33-34, 47-48. The Plaintiffs identified Dr. Armstrong on November 12, 2015. (Dkt. No. 61.) In addition, the court does not agree that the only issue in this case is when the toe wound developed, as discussed *infra*.

endocrinologist, not a vascular surgeon; 5) her opinions are based on irrelevant data. (Dkt. No. 92 at 4-9.)

The Plaintiffs do not seem to challenge that Dr. Dolven is an expert in endocrinology, but contend that she is the wrong expert for this case; a vascular surgeon is the appropriate expert. (Dkt. No. 92 at 1, 6-7.) Dr. Dolven has been a medical doctor for at least nineteen (19) years at the time of her deposition.[9] She is board certified in endocrinology, and before her retirement worked at the endocrinology outpatient clinic at the Medical University of South Carolina where diabetics "comprised a huge percentage of all endocrinology patients." (Dkt. No. 92-3 at 8.) She testified that endocrinologists are experts in diabetes care, including the causes, cures and treatment. *Id*. She has never been an expert witness in court before, and has been deposed only one time, regarding endocrinology issues. *Id* at 5.

## 1. SUMMARY OF EXPERT TESTIMONY

Dr. Dolven is an expert in the field of endocrinology; at her deposition, she indicated that endocrinologists are "experts in diabetes" and diabetic care. (Dkt. No. 92-3 at 5, 9.) She prepared a report dated May of 2015 and indicated in her deposition that she had not prepared (and did not intend to prepare) a supplemental report. (Dkt. No. 92-3 at 6-7.) She is not an expert in vascular surgery. (Dkt. No. 92-3 at 8.) Her written report opined;

> 1) that Mr. Dykes showed evidence of a foot infection prior to being transported from South Carolina to Missouri;
> 2) that over 50% of diabetics with foot ulcerations will eventually require amputation;
> 3) that smoking, sedentary life style, poor eating habits are all modifiable risk factors for peripheral artery disease;
> 4) that skin infections and ulcers are slow to heal typically as a result of poor blood flow to the infection site;
> 5) that sometimes blood flow to a compromised region can be restored prior to the onset of gangrene;

_____

[9] She retired at the end of 2015 to spend more time with her daughter. (Dkt. No. 92-3 at 5.)

6) that Mr. Dykes' symptoms suggest that he had peripheral artery disease long before being transported to Missouri;

7) that poor blood sugar control during transport would not have altered his clinical course; and

8) that Mr. Dykes' infection and any dying tissue may have caused high blood sugar during transport.

(Dkt. No. 92-1 at 1-2.)

Dr. Dolven's  written opinions were challenged during her deposition.

Q. All right. Now, does every patient or person with diabetes or poorly managed diabetes suffer limb amputation?
A. No.

Q. All right. Do a majority of patients who have diabetes and poorly managed diabetes suffer limb amputations?
A. No.

Q. All right. So it is a minority of those, correct, that suffer limb amputations?
A. Yes.

Q. Well, let me ask it a different way. Do you have an opinion in this case as to what the most probable cause or causes were of Mr. Dykes' limb amputation?
A. Yes.

Q. And that is what?
A. A combination of diabetes, smoking, huge factor is the smoking.

Q. Okay.
A. And his poor compliance or lack of medical compliance in that a diabetic like Mr. Dykes should probably have been on a couple of other medicines that were never listed on his medication lists chronically, comments having to do with his lack of physical activity and obesity. My analysis is that it was a combination of a variety of factors–

Q. Okay.
A. –that led to his gangrene and amputation.

(Dkt. No. 92-3 at 11-12.)

Dr. Dolven testified that a majority of patients with five risk factors (smoking, sedentary, obesity, high blood sugar, and lack of appropriate medication) "either suffer amputation or have what's called peripheral vascular disease, which can lead to amputation." (Dkt. No. 92-3 at 12.) She could not testify as to whether there were statistics available that indicated what percentage of

25

patients with those five risk factors suffer amputations. (Dkt. No. 92-3 at 12-13.) She testified that she has not participated in any such study or published such a study. (Dkt. No. 92-3 at 13.)

Dr. Dolven testified that diabetics with cellulitis (a bacterial skin infection) in the foot would require urgent medical attention, and that Mr. Dykes was in that category. (Dkt. No. 92-3 at 14.)

> Q. Okay. All right. And what are the treatment protocols for you as an endocrinologist if somebody presents to you with diabetes, all of these things, peripheral artery disease, poorly managed insulin, inadequate care, smoking, all of these things, and on top of that, they have a foot infection?
> A. Typically, if I were to see this person de novo, I would refer on to vascular surgery, I would refer on to–who would probably refer on to wound care or I would refer to wound care and start–depending on the severity of the cellulitis, either recommend admission for IV antibiotics or certainly give oral antibiotics.

(Dkt. No. 92-3 at 14.)

Dr. Dolven discussed the July 18, 2012 medical record from Gainesville Medical Clinic in Missouri. The record indicates that Mr. Dykes reported he had pain in his right foot and spots for four weeks. (Dkt. No. 92-3 at 28.) She questioned whether the spots had been present for four weeks "because there's no documentation that those lesions were there prior in the medical record . . . ." (Dkt. No. 92-3 at 28-30.) When asked how long "would it typically take in a patient such as Mr. Dykes for these lesions to turn black," Dr. Dolven testified that "they can crop up within 24 hours." (Dkt. No. 92-3 at 30.) When asked if there were a medical reference that would indicate "what the most common course or timing would be," Dr. Dolven stated, "I'd have to go search the literature. I did actually search the literature. And, no, I didn't–I'd have to search deeper. So I can't cite anything to you." (Dkt. No. 92-3 at 30.)[10] When asked whether the lesions typically develop over time, Dr. Dolven stated, "Not always, no." (Dkt. No. 92-3 at 30.)

> Q. See the highlighted portion on the bottom left there? What was the assessment or the diagnosis made that date [on July 18, 2012]?
> A. Nonhealing sores on the left foot, cellulitis. ...

---

[10] The court notes that Plaintiffs' expert, Dr. Armstrong, could not identify peer-reviewed literature on the timing of development of the foot wound. (Dkt. No. 91-3 at 122-123, 128.)

26

Q. Okay. And do you have any reason to believe or suggest or conclude scientifically how long that condition had existed for Mr. Dykes?
A. I can only reference you back to the medical documents that were provided before he was transported, and there was no mention of ulcerations, wounds on his feet. Whether they were there or not, I don't know, but there's–you know, we have to rely on the data we've got.

Q. Okay.
A. So it's hard for me to say, oh, yes, they were present before he left, even though the exam didn't note it.

Q. Right. But you–
A. Could have been there.

Q. –can't rule out the possibility or even the probability that these wounds developed while he, in fact, was in transport with ISC, can you? . . .
A. No. But there was another ten days after he arrived in the prison, too, where they could have developed.

(Dkt. No. 92-3 at 31.)

Dr. Dolven indicated there was no evidence Mr. Dykes had a lesion on his right great toe while he was in the care of the Hampton County Detention Center. (Dkt. No. 92-3 at 47-48.) Later in her deposition, she acknowledged that Mr. Dykes had complained about a black spot on his foot on July 10, 2012, which was two days after he arrived in Missouri.[11] (Dkt. No. 92-3 at 33-34.)

Dr. Dolven testified that, aside from when she was in medical school, she has not participated in a limb amputation procedure. (Dkt. No. 92-3 at 33.) She said that limb amputation was not part of her particular practice or specialty, and she has never participated in a "salvaging effort, like to prevent an amputation for a patient," as that is "done by vascular surgery and wound care." (Dkt. No. 92-3 at 33.)

Q. Okay. Based on the presentation that he made there at the medical facility in Missouri, do you believe that his foot or toe condition had reached the point of no return where he was ultimately going to suffer an amputation? ....
A. No.

_____

[11] Apparently the note on July 18, 2012 indicates the spot had been on Mr. Dykes' toe for 2 weeks and also 4 weeks. (Dkt. No. 92-3 at 34.)

Q. Okay. Tell me why you say that.

A. Because, like I said earlier, I mean, he could have been assessed at that point with vascular studies and perhaps only suffered from debridement, if you will. So they would cut around and cut out the dead tissue without having to amputate a toe or a foot.

Q. Okay. But that wasn't done?

A. No.

(Dkt. No. 92-3 at 34.)  When she was asked whether she believed Mr. Dykes' foot infection "was most probably a causative factor in the amputation, amputations he ultimately suffered," Dr. Dolven indicated "most probably, to a reasonable degree of medical certainty." (Dkt. No. 92-3 at 36.)

When asked why that was not addressed in her report, Dr. Dolven stated,

A.  Because I was focusing on the hyperglycemia and hypoglycemia that apparently he suffers from, and I thought the complaints that Mr. Dykes had were from his diabetes, meaning hyper and hypoglycemia were related to amputation, which is what I focused on [in my report].

. . .

Q. Okay. If you were to revise your report to include the medical evidence surrounding his foot infection, how would you revise it?

A. Well, I would have to sit and think about that for a little bit. I'm sure I would talk about the importance of medical compliance and all of the risks that Mr. Dykes presented with when he got on that van to go to Missouri and the chances that he would end up, given his lifestyle, and his treatment with amputations was, was fairly high to begin with. That the trans–well, I can't–it would take another, you know, sitting down and composing something. I can't talk off the cuff–

Q. Let me–sure.

A. –about what my report would look [like] if that were the focus.

Q. Okay. So infection is a serious thing that needs to be appropriately addressed, correct?

A. Yes.

Q. All right. And that risk of developing a complication or a bad outcome from an infection is even greater in someone such as Mr. Dykes?

A. Oh, yes.

Q. Because he has diabetes and all of these other risk factors?

A. And because he smokes and because he doesn't–yeah. Yes.

Q. Correct? All right. But there's no way to scientifically say that he, just because he's overweight and he smokes and he has diabetes, that he's ultimately going to suffer limb amputation, correct?
A. Correct.

Q. All right. But when you add to it the complication of a foot infection, that puts him in a whole different risk category, does it not?
A. It does.

Q. All right. And are you aware of any medical studies that evaluate those specific risk factors? In other words, you have a person with diabetes that's not properly managed, that's overweight, that has a history of smoking, and then they give those persons infections to see how they do with it?
A. That would be unethical, wouldn't it?

(Dkt. No. 92-3 at 36-38.)

Dr. Dolven agreed that "the issue of whether [Mr. Dykes] had poor or adequate or good or some other description of insulin control or blood sugar control is not really a deciding factor in this case." (Dkt. No. 92-3 at 46.) She agreed that "the things that are deciding factors relate to his foot and lower legs and the infection that he had there." (Dkt. No. 92-3 at 46.) Dr. Dolven also agreed that diabetic persons who have foot ulcers are at a great risk to have recurrent foot ulcers, as Dr. Armstrong testified. (Dkt. No. 92-3 at 23.)

2. ANALYSIS

The Plaintiffs' Motion to Exclude is **DENIED**. Dr. Dolven is a qualified endocrinologist with extensive experience treating diabetics. Her general knowledge will be helpful to the jury at trial, is obviously relevant, and is reliable because it is based on her experience as a board certified endocrinologist working at an outpatient clinic with a huge percentage of diabetic patients. Her opinion that a majority of diabetics with the risk factors of smoking, sedentary lifestyle, obesity and poor blood sugar management, may suffer amputation or development of peripheral vascular disease, which can lead to amputation, is hardly a novel concept. *See* "Amputation and Diabetes: How to

protect your feet."[12] This testimony is relevant to the defense of comparative negligence and to causation. The lack of peer-reviewed literature on this opinion is a ground for cross-examination, not a ground to disqualify her opinion which is based on her years of experience with diabetic patients.

Plaintiffs complain that Dr. Dolven's report focused exclusively on the fact that Mr. Dykes was at risk for amputation prior to his incarceration and that she completely ignored the "lack of care that Mr. Dykes was forced to suffer" and therefore her opinions cannot be tested and lack credibility. During Dr. Dolven's deposition, Plaintiffs' counsel inquired into the focus of the written report and then had her expand her opinions to areas that Plaintiffs say her written report lacked, and which appear to benefit Plaintiffs' case:

> 1) Mr. Dykes showed evidence of foot infection prior to being transported from South Carolina to Missouri (Dkt. No. 92-1 at 1);
>
> 2) the foot infection was most probably a causative factor in the amputation Mr, Dykes ultimately suffered (Dkt. No. 92-3 at 36);
>
> 3) Dr. Dolven could not rule out the possibility that the wounds developed during transport (Dkt. No. 92-3 at 11);
>
> 3) Mr. Dykes' foot had not reached the point of no return upon arrival at Missouri because he could have been assessed and treated with debridement (Dkt. No. 92-3 at 36-38); and
>
> 4) the risk of complications from foot infection was greater for someone with Mr. Dykes' risk factors (Dkt. No. 92-3 at 36-38).

---

[12] www.mayoclinic.org/diseases-condition/diabetes/in-depth/amputation-and-diabetes:

> proper diabetes management and careful foot care can help prevent foot ulcers. ...The best strategy for preventing complications of diabetes - including foot ulcers - is proper diabetes management with a healthy diet, regular exercise, blood sugar monitoring and adherence to a prescribed medication regimen. ... Don't smoke. Smoking impairs circulation and reduces the amount of oxygen in the blood. These circulatory problems can result in more severe wounds and poor healing.

These additional opinions, which take into account the lack of care received by Mr. Dykes, eliminate Plaintiffs' argument that pertinent information was ignored.

Plaintiffs' argument that the opinion should be excluded because it was prepared solely for litigation, also goes to weight, not admissibility of the opinion. "[O]therwise reliable expert testimony will be admitted even if litigation driven." *Sanchez v. Boston Sci. Corp.,* 2014 WL 4851989, at *9 (S.D.W. Va. Sept. 29, 2014); *see also Tyree v. Boston Sci. Corp.*, 54 F.Supp. 3d 501, 531, 548 (S.D.W. Va. 2014); *Eghnayem v. Boston Sci. Corp.*, 57 F.Supp. 3d 658, 670 (S.D.W.Va. 2014) ("an expert's formulation of his or her opinion for the purposes of litigation does not, by itself, justify that expert's exclusion. ... I will not exclude an expert on the sole basis tht the opinion arose during litigation, so long as it is otherwise reliable."). Because this court finds Dr. Dolven's opinions to be both relevant and reliable, the fact that the opinion is litigation driven does not render it inadmissible.

Plaintiffs' claim, that since Dr. Dolven's opinions are outside the crux of this case because she is not a vascular surgeon, is without merit. As discussed *supra* regarding Dr. Armstrong's testimony, this case involves a continuum of care, or lack thereof, by several entities; therefore Mr. Dykes' medical history/risk factors and treatment before amputation are relevant to the issues of causation and comparative negligence. At her deposition, Dr. Dolven expanded her opinions beyond the risk factors to the areas that Plaintiffs' counsel wanted, as described *supra*, also using her experience as her guide. She did not go beyond her area of expertise in her opinions. She noted at which point in treatment she would refer a patient to the vascular surgeon. (Dkt. No. 92-3 at 14.)

The court finds by a preponderance of the evidence that the expert testimony of Dr. Dolven is relevant and reliable and is subject to testing by vigorous cross-examination at trial, presentation of contrary evidence, and careful instruction on the burden of proof. The Plaintiff's Motion to Exclude Certain Opinion Testimony By Dr. Sarah Dolven is **DENIED.**

31

**IV.**    <u>**Plaintiffs' Motion to Exclude Designated 30(b)(6) Testimony (Dkt. No. 93)**</u>

The Plaintiffs move to exclude the testimony of Randy Cagle, the Defendant transport company's president and 30(b)(6) designee. (Dkt. No. 93.) The motion was filed on May 23, 2016, twenty-one (21) days after the end of the discovery period. The Defendant responded (Dkt. No. 94); the Plaintiffs replied (Dkt. No. 100); and the Defendant sur-replied. (Dkt. No. 102). The Plaintiffs' main complaints are that the Defendant failed to comply with the District Court's order of January 4, 2016, requiring the Defendant to provide further documents pursuant to Plaintiffs' Request to Produce in thirty (30) days; and there was no second deposition of Mr. Cagle.

This case has been fraught with problems since its removal to federal court on September 10, 2014. The Plaintiffs' counsel at the time was Jared Newman and U.S. Magistrate Judge Wallace W. Dixon issued the first scheduling order. (Dkt. No. 5.) Plaintiffs' request for extension of time to complete discovery was granted by Judge Dixon on December 15, 2014, which extended the discovery deadline to May 30, 2105.  (Dkt. No. 13, Second scheduling order.)  Plaintiffs filed another motion to amend the scheduling order, which was granted by the undersigned on March 19, 2015, which extended the discovery deadline to July 15, 2015. (Dkt. No. 23, Third Scheduling Order.)  Mr. Newman was relieved and Mr. Lucas Paulick appeared in the case on May 11, 2015. On July 28, 2015, by consent of all parties, the scheduling order was amended once again with discovery due by October 14, 2015, which clearly stated that any further requests to extend the deadlines would be ruled upon by the District Judge. (Dkt. No. 45, Fourth scheduling order.)

On December 1, 2015, the parties moved again to amend the scheduling order; this motion was denied by the District Court, then granted after reconsideration and a hearing before the District Court on January 4, 2016. At the hearing, the District Court ruled in no uncertain terms that it was extending the deadlines one last time, with 120 more days for discovery; that the Defendant had thirty (30) days to produce further records; that both parties were to make this case a priority; and that the parties should not seek another extension of discovery. The last scheduling order was entered

on January 5, 2016, which extended the discovery deadline to May 2, 2016. (Dkt. No. 79, Fifth Scheduling Order.)

Despite the District Court's warning, on April 13, 2016, the parties moved for another extension – for what would be a sixth scheduling order in this case – and requested three (3) additional months for discovery. (Dkt. No. 88.) The undersigned denied the motion to amend/correct the scheduling order on April 14, 2016. (Dkt. No. 89.) No motion or order staying discovery was entered from the inception of this case. [13]

To the extent that the Plaintiffs claim the Defendant did not comply with the District Court's order giving Defendant thirty (30) days to produce further records, a motion for sanctions was heard by the undersigned on February 29, 2016, in which the motion was denied without prejudice **"upon agreement between the parties for production of various documents, including the Affidavit of Randy Cagle."** (Dkt. No. 86.) Plaintiffs did not file a Motion to Compel before the end of the discovery deadline, instead choosing to file the instant motion to exclude Mr. Cagle's testimony on May 23, 2016.

Rule 37 of the Federal Rules of Civil Procedure provides, in relevant part,

If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--*fails to obey an __order__ to provide or permit discovery*, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

---

[13] No party ever requested a stay of discovery in this case, although various motions were filed and ruled upon during the course of the case. See Dkt. Nos. 18, 26, 30, 33, 39, 42, 62, 86.

FED. R. CIV. P. 37(b)(2)(A) (emphasis added). To impose sanctions under Rule 37, a court must consider four factors: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Belk v. Charlotte–Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir. 2001).

With respect to the Defendant's documents which were to be produced, the purpose of the record production was to identify the drivers of the transport van, which records were produced before the February 29 hearing; and to identify what other prisoners were on the van with Mr. Dykes. It is clear from the transcript of the February 29 hearing that Mr. Cagle had searched through six hundred (600) to seven (700) transport records; that some records were produced, including records that identified nine other passengers in the transport van with Mr. Dykes. Defendant asserted at the hearing that the van could only seat ten (10) passengers, so Mr. Dykes would be the tenth passenger. The affidavit of Mr. Cagle ordered on February 29, 2016 does not seem to be at issue. The February 29 record anticipates another deposition of Mr. Cagle if the affidavit was not sufficient to explain Mr. Cagle's search efforts and completeness of his response. The undersigned urged the parties to come back via motion to the court if there were any disputes, cautioning that the court did not "want anything to hold up the rest of the discovery." The Defendant agreed to provide Mr. Cagle's affidavit in fourteen (14) days. Plaintiffs failed to file a motion to compel after the February 29, 2016 hearing.

With respect to a second deposition of Mr. Cagle, the record does not reflect that one was **ordered** by either the undersigned or the District Judge. The February 29 transcript reflects that one might be necessary if Mr. Cagle's affidavit was not sufficient, and the court had no objection to it. The parties waited until early April to discuss the timing of this second deposition of Mr. Cagle, but schedules for both Plaintiffs' and Defendant's counsel interfered with setting a mutually agreeable time, and there was a dispute over the scope of the deposition. (Dkt. Nos. 93 at 2-3; Dkt. No. 95; Dkt. No. 100; and Dkt. No. 102.) The April 13, 2016 motion to amend the scheduling order for

34

another three (3) months of discovery was denied based on the District Court's strong statement at the January 4 hearing that no further extensions would be granted.

The undersigned does not find that either party acted in bad faith; both parties have displayed a lack of diligence which has haunted this case from its inception. This has been noted by both the District Court in the January 4 hearing and the undersigned in the February 29, 2016 hearing. The court also finds that Plaintiffs suffer no prejudice from the inability to depose Mr. Cagle; Plaintiffs already deposed Mr. Cagle when represented by other counsel and questioned Mr. Cagle about his method of record-keeping, or lack of record-keeping. Plaintiffs have requested a jury instruction on Defendant's "misconduct" without specifying the terms of that instruction. The scope of Mr. Cagle's cross-examination, should he be a witness at trial, and any jury instruction on discovery abuse, is premature and best left to the trial judge.

The undersigned does not find any discovery abuse for purposes of this motion. The undersigned **DENIES** Plaintiffs' Motion to Exclude Testimony of Randy Cagle.

## V.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 90)

Defendant asserts it is entitled to summary judgment because Plaintiffs "have the burden of proof, yet only provide testimony that was speculative, lacking in any qualified expert testimony regarding any negligence or violation of any industry custom or standard by ISC, and lacking qualified testimony ISC's conduct proximately caused the alleged injury." (Dkt. No. 90-1 at 1 of 24.) Defendant further states,

> Plaintiff Michael Dykes' allegations for this lawsuit differ from the opinions claimed by his podiatric surgeon expert, Dr. David Armstrong, from Arizona, who has never treated Dykes, met Dykes, or spoken with Dykes. And both of those versions differ from the available medical records and other documents.

(*Id*. at 2 of 24.)

## A.    SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). Conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## B.    NEGLIGENCE/GROSS NEGLIGENCE

Defendant asserts that it is entitled to summary judgment on the negligence/gross negligence claim "because Plaintiffs present only speculative evidence that does not support a legal claim." (Dkt. No. 90-1 at 11 of 24.) Defendant makes many factual arguments in its memorandum, but its legal analysis with respect to the negligence claim is sparse. For the reasons set forth herein, the undersigned recommends denying Defendant's Motion for Summary Judgment as to Plaintiffs' negligence claim.

In order to establish a cause of action for negligence, a plaintiff must prove the following four elements:

36

> (1) a duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; (3) resulting in damages to the plaintiff; and (4) damages proximately resulted from the breach of duty.

*Roddey v. Wal-Mart Stores E., LP*, 415 S.C. 580, 589, 784 S.E.2d 670, 675 (2016); *Thomasko v. Poole*, 349 S.C. 7, 12, 561 S.E.2d 597, 599 (2002) (citing *Bloom v. Ravoira*, 339 S.C. 417, 529 S.E.2d 710 (2000)). "The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was **at least one of the proximate causes** of the injury." (emphasis added.) *Roddey,* 784 S.E.2d at 676.

"The court must determine, as a matter of law, whether the law recognizes a particular duty. If there is no duty, then the defendant in a negligence action is entitled to judgment as a matter of law." *Madison ex rel. Bryant v. Babcock Center, Inc.*, 371 S.C. 123, 135-36, 638 S.E.2d 650, 656 (2006) (citations omitted). Defendant claims that Plaintiffs have produced no qualified expert testimony regarding any violation of an industry custom or standard or any qualified testimony on proximate cause. (Dkt. No. 90-1 at 1.)

In the opinion of the undersigned, the law recognizes a duty of care owed by Defendant to Mr. Dykes and the Plaintiffs have provided evidence of such a duty. The evidence in this case indicates that Defendant contractually agreed to transport Mr. Dykes, a detainee, from the Hampton County Detention Center to a facility in Missouri. The Restatement (Second) of Torts, Section 323, provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323; *see also Babcock Center*, 371 S.C. at 136-37, 638 S.E.2d at 657 (finding a duty of care where, *inter alia*, the case fell "within the circumstances outlined in" Section 323 of the Restatement (Second) of Torts). Given that Defendant had custody and control

of Mr. Dykes, certainly Defendant owed him some legal duties. *See* Restatement (Second) of Torts § 323; *cf. Babcock Center*, 371 S.C. at 142, 638 S.E.2d at 660 ("[U]nder the common law, a private person or business entity which accepts the responsibility of providing care, treatment, or services to a mentally retarded or disabled client has a duty to exercise reasonable care in supervising the client and providing appropriate care and treatment to the client."); *Rayfield v. S.C. Dep't of Corrs*., 297 S.C. 95, 109-110, 374 S.E.2d 910, 918 (Ct. App. 1988) (stating, in the context of a failure to prevent a third party (Lucas) from injuring the decedent, "[a] special relationship arose, if at all, from the custody the Department of Corrections exercised over Lucas. While the Department had charge of Lucas, it arguably owed a duty of care to others to prevent foreseeable harm Lucas might do them. But once the Department's custody of Lucas ended, it no longer had charge of him, and the special relationship based on custody ended.").

"Once a duty has been established, it is the further function of the court to determine and formulate the standard of conduct to which the duty requires the defendant to conform." *Doe ex rel. Doe v. Wal-Mart Stores, Inc.*, 393 S.C. 240, 247, 711 S.E.2d 908, 912 (2011) (citing 57A Am.Jur.2d Negligence § 132). As explained in *Doe*,

> The fact finder may consider relevant standards of care from various sources in determining whether a defendant breached a duty owed to an injured person in a negligence case. The standard of care in a given case may be established and defined by the common law, statutes, administrative regulations, industry standards, or a defendant's own policies and guidelines.

*Doe*, 393 S.C. at 247, 711 S.E.2d at 912 (internal quotation marks and citations omitted); *see also Babcock Center*, 371 S.C. at 140-41, 638 S.E.2d at 659 (citations omitted) ("The standard of care in a given case may be established and defined by the common law, statutes, administrative regulations, industry standards, or a defendant's own policies and guidelines.").

Here, Plaintiffs presented evidence that Defendant had the following policies, among others:

Upon receiving medical clearance all medical forms and medications are checked by agents receiving custody of inmate. Only medication listed on the medical form will be transported with the inmate. . . .

No inmate will be transported without meds deemed necessary for travel and inmates well being. . . .

If an inmate develops any kind of problem or complication while in transit, he or she will be immediately taken to the nearest hospital for treatment. ...

All agents are trained to dispense any and all medication. If inmate is insulin dependent diabetic blood sugar is tested at a minimum of 4 times a day. Agents will draw insulin for the inmate and then supervise the inmate administering the shot to them.  . . .

If an inmate develops serious medical problems such as complications caused by medications or pass out, become unresponsive, or develop any serious injury, an immediate call goes out for an ambulance if hospital is not close.

(Dkt. No. 92-3 at 25-26; and Dkt. No. 104, Ex. 1.)

In the case *sub judice*, there is evidence that Defendant violated its own policies. There is evidence that Mr. Dykes had ongoing recent foot ulcers and did not receive his antibiotic ointment during transport, prescribed on June 12 and June 15 before incarceration, and later by Dr. Bush on July 2. The medical records reveal that Mr. Dykes was seen on June 12, 2012, and that he then had a "small (less than dime sized[)] noninfected ulcer to the medial malleolar area of the right ankle." (Dkt. No. 90-4 at 2 of 4.) For this wound, Mr. Dykes was prescribed Bactroban; the notes state, "Started Bactroban 2%, Apply Ointment bid to wound on foot, 30 Ointment, 06/12/2012, Ref. x2." (Dkt. No. 90-4 at 3 of 4.) Mr. Dykes was seen three days later, on June 15, 2012; that medical record indicates that Mr. Dykes has "open lesions on feet b/1" and/or "+2 mm scabbed wound on R medial malleous, no drainage." (Dkt. No. 90-5 at 1-2 of 3.) The June 15, 2012 record indicates that the patient was counseled on "wound care and report[ing] worsening of symptoms/fever" and that he was to "use bactroban oint for wound." (Dkt. No. 90-5 at 3 of 3.) Mr. Dykes also testified during his deposition that when he saw Dr. Bush on July 2, 2012, Dr. Bush gave him "a tube of triple antibiotic

cream." (Dkt. No. 91-2 at 39.) Despite these medical records and Mr. Dykes' deposition testimony, there is evidence that Mr. Dykes did *not* have the ointment while he was in transit from South Carolina to Missouri. In his deposition, Mr. Dykes stated that Hampton County did not give Inmate Services Corporation the Bacitracin; he says the "only thing" he remembers seeing Hampton County give ISC was "a bag with that insulin and some needles in it, and that's–and they threw that up on the dashboard." (Dkt. No. 91-2 at 122-23.) Mr. Dykes stated that he was not allowed to apply bacitracin ointment even one time during the trip with ISC. (Dkt. No. 91-2 at 124-25.)

Additionally, while there is some evidence that Defendant purchased diabetic supplies for Mr. Dykes (*see* Dkt. No. 90-8; Dkt. No. 90-9), Mr. Dykes stated during his deposition that there was "no monitoring" of his blood sugar on the trip from South Carolina to Missouri. (Dkt. No. 91-2 at 134-35.) He also testified in his deposition that he was not able to take his insulin during the transport; when asked what material, documents, or medications he brought with him on the trip to Missouri, Mr. Dykes stated,

> The only thing they gave me from the jail is they give me some needles and some insulin and the drivers threw it up on the dashboard. It was about 110 degrees, so the insulin was shot within 20 minutes. I couldn't take it because it was boiling in the sun through the windshield.

(Dkt. No. 91-2 at 45.) [14] Mr. Dykes also stated that he "went into a coma in the van" on the third day of the transport; he stated:

> The third day in the van I fell out. What happened is my blood sugar dropped to the point that I passed out. And, like I said, they turned the girl loose–an inmate loose in the van because they did not know what to do.
> They ran up in a truck stop and she grabbed some orange juice and shoved it down my throat and she told me that I was out for about 15 to 20 minutes. And as soon as I came to, they jumped back in the van and took off.
> And the one driver, it flipped–it flipped him out pretty bad, he didn't–he didn't know what to do. He–he actually gave me a couple pieces of candy and I remember that

_____

[14] The Defendant provided two receipts for diabetic supplies to contradict Mr. Dykes' testimony. However, the Defendant provided **no** testimony or documentary evidence that Mr. Dykes' blood sugar was actually tested or that any insulin was administered during the transport.

40

and that was all I remember. The other guy is–they were just wanting to get me to where I had to go at that point.

(Dkt. No. 91-2 at 55-56.) Mr. Dykes indicated that Defendant's agents transporting him did not take him to a hospital or call an ambulance for him as a result of this incident; they simply continued the journey to Missouri. (Dkt. No. 91-2 at 58-59.)

While this evidence is disputed, the record contains evidence that–in contravention of Defendant's policies–Mr. Dykes was transported without all of his necessary medication; his insulin taken on the trip was not properly dispensed; and he was neither taken to a hospital nor was an ambulance called when he developed a complication during transit. In addition, the evidence shows that the Defendant was on notice that Mr. Dykes was a diabetic with mobility problems (he had to be helped into the van); he was insulin dependent; he was shackled at the ankle and chained to the floor with no protective footwear; and he passed out for fifteen (5) to twenty (20) minutes and received no medical treatment, in violation of Defendant's own policies. The Defendant has provided no testimony or evidence that these events did not occur. The Defendant's arguments focus mostly that there is no definitive evidence that the toe wound developed during transport. The case is broader than the one issue of when the black spot appeared.

The Defendant's own expert in the case opines that Mr. Dykes' foot infection may have caused his blood sugar problems. A jury could infer from this testimony that had the Defendant tested Mr. Dykes' blood sugar after administering his prescribed dose, the drivers would have uncovered the unusual problem of high blood sugar despite normal medication; the Defendant should have sought medical care for Mr. Dykes; and the infection may have been caught and treated. A fair interpretation of the evidence is that, if Mr. Dykes had received medical care when he passed out in the van, the medical professionals could have discovered the infection in his foot; and would have been able to provide treatment short of amputation, such as debridement. (Dkt. No.92-3 at 14, 34; Dkt. No. 91-3 at 122-23.)

41

In the opinion of the undersigned, this evidence is sufficient to withstand Defendant's Motion for Summary Judgment as to the negligence claim. *See Roddey,* 784 S.E.2d at 675 ("Evidence of a company's deviation from its own internal policies is relevant to show the company deviated from the standard of care, and is properly admitted to show the element of breach."). Accordingly, the undersigned recommends **DENYING** Defendant's Motion for Summary Judgment as to Plaintiffs' claim for negligence.

C.    CLAIM PURSUANT TO 42 U.S.C. § 1983

1.    STATE ACTOR

Defendant also seeks summary judgment on Plaintiffs' claim pursuant to 42 U.S.C. § 1983. (*See* Dkt. No. 90-1 at 19- of 24.) In order to state a cause of action under § 1983, a plaintiff must allege that (1) the named defendant deprived him of a federal right, and (2) the defendant did so under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The Defendant claims that it did not act under color of state law, but is an independent contractor. (Dkt. 90-1 at 19-20.) In *DeBauche v. Trani*, 191 F.3d 499, 506 (4th Cir.1999) the Fourth Circuit set out the "four exclusive circumstances" under which a private party could be deemed a state actor, including "when the state has sought to evade a clear constitutional duty through delegation to a private actor ... [or] delegated a traditionally and exclusively public function to a private actor".

In *Nave v. Trans-Cor of America*, No. 8:06-1065, 2007 WL 2156670, at *4 (D.S.C July 26, 2007), the District Court refused to dismiss a § 1983 action against a prison transport company on the grounds that it was not a state actor. The *Nave* court stated that:

> [v]arious district courts have allowed plaintiffs to proceed in claims brought pursuant to § 1983 against private corporations that provide prison transport services. *See, e.g., Dailey v. Hunter,* No. 04-392, 2006 U.S. Dist. LEXIS 82412, at *12 (M.D.Fla. March 22, 2006) (finding that plaintiff had sufficiently pleaded that defendant TransCor acted under color of state law for § 1983 purposes based on TransCor's alleged contract for prisoner transportation with county jail); *Irons v. TransCor America,*

42

*Inc.,* No. 01-4328, 2006 U.S. Dist. LEXIS 9685, *12 (E.D.Pa. March 9, 2006) (denying summary judgment in § 1983 action because there existed a genuine issue of material fact as to whether defendants were state actors since private prison companies obtain custody over prisoners only by way of state authorization and plaintiff established that "defendants exercised control over him comparable to incarceration"); *Wine v. Dep't of Corrs.,* No. 00-704, 2000 U.S. Dist. LEXIS 22555, at *8-9 (W.D. Wis. Dec. 27, 2000) (finding that it would be inappropriate to dismiss Defendant as a defendant in § 1983 action because plaintiff had alleged facts sufficient to proceed against the defendant as a state actor).

*Nave*, 2007 WL 2156670 at *4.

The Defendant was contracted by a state agency, the Ozark County Sheriff's Department to act in its stead, ie. to transport a person in custody to another detention facility, a traditionally public function. (Dkt. No. 90-7 at 1.) The authority to transport Mr. Dykes was obtained only way of state authorization. The undersigned recommends **DENYING** Defendant's Motion for Summary Judgment on the ground that the Defendant is not a state actor.

2.     SUFFICIENCY OF EVIDENCE

The Defendant also argues that the Plaintiffs have not proven sufficient facts to establish that it was deliberately indifferent to a serious medical need. As a pretrial detainee, the protections given by the Due Process Clause of the Fourteenth Amendment apply to the Plaintiffs' case. *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 250 (4th Cir. 2005). Deliberate indifference towards a pretrial detainee's serious medical need violates the Due Process clause of the Fourteenth Amendment. *Young v. City of Mount Ranier*, 238 F.3d 56, 575 (4th Cir. 2001); *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (applying deliberate indifference standard to pretrial detainee's claim that he was denied needed medical treatment), *cert. denied*, 529 U.S. 1067 (2000). "The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990)(citations omitted.)

The Supreme Court has reviewed the Eighth Amendment prohibition of punishments which "involve the unnecessary and wanton infliction of pain" in the case of *Estelle v. Gamble*, 429 U.S. 97 (1976.) The Court stated:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners Constitutes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 182-83 (1976), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying the access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under §1983.

*Estelle*, 429 U.S. at 103-105. (Footnotes omitted.)

"The test for deliberate indifference has two parts:  First, whether the deprivation of medical care was sufficiently serious (objective component) and second, whether there existed a culpable state of mind (subjective component)." *Harden v. Green*, 27 F. App'x 173, 176 (4th Cir. 2001) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). To satisfy the first part of the test, a plaintiff must show that the injury was objectively serious. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal citation omitted).

To satisfy the subjective component, a plaintiff must show that a defendant knew of and disregarded the risk posed by the serious medical need. *Farmer*, 511 U.S. at 837. Two components must be shown to show that a defendant had a culpable state of mind. First, actual knowledge of the risk of harm to the inmate is required. *Iko,* 535 F.3d at 241 (citing *Young*, 238 F.3d at 575-76); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) ("It is not enough that officers should have recognized [a substantial risk of harm].") Second, a defendant "must *also* have 'recognized that *his actions were insufficient*' to mitigate the risk of harm to the inmate arising from his medical needs." *Iko*, 535 F.3d at 241 (citing *Parrish*, 372 F.3d at 303) (emphasis in original).

44

"Negligen[ce] in . . . treating a medical condition" is not actionable under §1983. *Id.* (quoting *Estelle*, 429 U.S. at 106). Deliberate indifference to a serious medical need "describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. The fact that a plaintiff's medical complaint remains after treatment does not show deliberate indifference as the Constitution does not mandate a cure. *Hooks v. Delany*, No. 2:12-CV-305-MGL-BHH, 2013 WL 353275, at *7 (D.S.C. Jan. 7, 2013), *report and recommendation adopted*, No. 2:12-CV-305-PMD, 2013 WL 353559 (D.S.C. Jan. 29, 2013) (citing *Armour v. Herman*, No. 1:05-CV-295-TLS, 2005 WL 2977761, at *3 (N.D.Ind. Nov. 4, 2005) (holding "[t]he Eighth Amendment does not require medical success . . . .")).

There is sufficient evidence to survive summary judgment on the objective and subjective components to establish a deliberate indifference to a serious medical need. The deprivation of medical care was sufficiently serious. The Defendant's one page policy specifically addresses the needs of diabetics for blood sugar monitoring and administration of insulin. (Dkt. No. 104, Ex. 1.) Withholding monitoring and insulin to a diabetic: is easily recognized as mandating treatment; and is serious even to lay person and especially to an employee of the Defendant who ostensibly is trained on company policy. Failure to obtain medical treatment for an insulin-dependent diabetic who passes out for fifteen (15) to twenty (20) minutes is even more serious and inexplicable.

The Defendant was on actual notice of the risk of harm. Mr. Dykes was an insulin dependent diabetic. Even if the Plaintiffs' evidence were discounted, the receipts for diabetic supplies produced by the Defendant is evidence of its knowledge of Mr. Dykes' condition. Taken in the light most favorable to the Plaintiffs, the evidence shows that Defendant was on notice that the Defendant had mobility problems, as he had to be helped into the van. The Defendant chose not to get medical treatment when Mr. Dykes passed out in the van.

Taking the evidence in the light most favorable to the Plaintiffs, the undersigned finds that there is sufficient evidence, and disputed issues of fact, as to whether the Defendant was deliberately

45

indifferent to Mr. Dykes' serious medical needs. There are material issues of fact evidencing deliberate acts by the Defendant: 1) Mr. Dykes' medication, provided to Defendant by the Hampton County Detention Center, was not properly stored and was not administered during transport, in violation of Defendant's own policies; 2) the antibiotic ointment prescribed by Dr. Bush was not provided, in violation of Defendant's own policies; 3) Mr. Dykes' blood sugar was not monitored, in violation of Defendant's own policies; 4) Mr. Dykes received no treatment when he passed out, in violation of Defendant's policies. All of these inactions occurred, even though during a short three (3) day trip, at a time when Mr. Dykes was at his most vulnerable for serious complications with his foot. Perhaps most significant, if Mr. Dykes had received medical attention at the time he passed out in the van, there was a chance to have the foot infection treated before it became so rampant that amputation was the only choice.

The court finds there are sufficient disputed issues of material fact as to whether the Defendant was deliberately indifferent to Mr. Dykes' serious medical needs. The undesigned recommends that Defendant's Motion for Summary Judgment be **DENIED**.

## VI.   CONCLUSION

It is therefore **ORDERED** that Defendant's Motion to Exclude Plaintiffs' Proposed Expert, Dr. David Armstrong (Dkt. No. 91) is **DENIED**; Plaintiffs' Motion to Exclude Expert Testimony (Dkt. No. 92) and Plaintiffs' Motion to Exclude Designated 30(b)(6) Witness Testimony (Dkt. No. 93) are **DENIED.**  It is therefore **RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 90) be **DENIED**.

January 23, 2017

Charleston, South Carolina

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).